FAUST OPPENHEIM LLP
David I. Faust (DF-9739)
Petra von Ziegesar (PV-3568)
488 Madison Avenue, 17th Floor
New York, New York 10022
T: (212) 751-7700
Attorneys for Defendant, Progetra SA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

PETRACO OIL CO. LTD.,

                Plaintiff,

       -against-

PROGETRA SA,

                Defendant.

-------------------------------------------------------x

Index No. 08cv03115 (PAC)


**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT
OF PROGETRA SA'S MOTION TO VACATE THE RULE B ATTACHMENT
OF PLAINTIFF AND DISMISS THE VERIFIED COMPLAINT**

## TABLE OF AUTHORITIES

**Cases**                                                                                        **Page**

Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.,
460 F.3d 434, 443 (2d Cir. 2006) .................................................................... .    3, 4

Aston Agro-Insutrial AG v. Star Grain Ltd.,
2006 WL 3755156 (S.D.N.Y.  2006)..................................................................    3

Centrament Trading S.A. v. Egyptian American Steel Rolling Co.,
07-cv-6379 (RMB) (S.D.N.Y. Sept. 28, 2007)..............................................    2

C.T. Shipping, Ltd. v. DMI (U.S.A.) Ltd.,
 774 F.Supp. 146 (S.D.N.Y.,1991) ...................................................................    5

Egyptian Navigation Co. v. Baker Investments Corp.,
2008 WL 1748456 (S.D.N.Y. 2008)..................................................................    4

Padre Shipping, Inc. v. Yong He Shipping,
2008 WL 1869212, *5 (S.D.N.Y. 2008)............................................................    2

Tide Line, Inc. v. Eastrade Commodities, Inc.,
2007 AMC 252 (S.D.N.Y. 1979) ......................................................................    4


**Other Authorities**                                                                             **Page**

Convention on the Recognition and Enforcement of Foreign Arbitral Awards ............    5, 6
Convention of the Service Abroad of Judicial and Extrajudicial Documents in Civil
or Criminal Matters (done at The Hague, November 15, 1965) ...................................    7
Federal Arbitration Act ........................................................................................    5, 6
Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims ..........    6
Rule E(4)(f) of the Supplemental Rules for Certain Admiralty and Maritime Claims..    1
Rule 4 of the Federal Rules of Civil Procedure .............................................................    7
Rule 12(b)(1) of the Federal Rules of Civil Procedure.................................................    1
Individual Practices of Judge Paul A. Crotty..................................................................    1
Criminal Code of Switzerland, Article 271 ...................................................................    7

Defendant, PROGETRA SA ("PROGETRA"), through its attorneys, Faust Oppenheim LLP, submits this reply memorandum of law in further support of its motion to vacate the Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims ("Supplemental Rules") attachment, quash the order directing the clerk to issue attachment and garnishment and dismiss the Verified Complaint of plaintiff PETRACO OIL CO. LTD ("PETRACO"), pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure and Rule E(4)(f) of the Supplemental Rules as well as for an award of interest on the wrongfully attached funds, legal fees, costs and such other relief as the Court deems just.

Plaintiff interestingly leaves its "final and most significant issue" to page 18 of its 24 page memorandum of law[1] after first peppering this Court with irrelevancies and distractions. <u>The only relevant issue is whether this Court has jurisdiction in this matter based on the claims which have been clothed as "maritime"</u>. If this Court lacks jurisdiction over the claims in this case wrongly labeled as "maritime", it has no subject matter or personal jurisdiction over any other matters raised by plaintiff or intervenor. Defendant will address this issue first and comment on plaintiff's other points in reverse order.

<div align="center">

**REPLY TO POINT VIII**
**<u>THIS COURT LACKS MARITIME JURISDICTION</u>**

</div>

This Court lacks jurisdiction in this case. The alleged maritime claims are merely incidental to the sales terms in the Purchase Contract. The two cases on which plaintiff rely in this section of its opposition actually favor defendant. First, plaintiff admits that

---

[1] Plaintiff's memorandum of law violates Individual Practices of Judge Paul A. Crotty Rule #3G which requires a table of contents in memoranda exceeding 10 pages.

the Purchase Contract calls for arbitration in London under English law and cites <u>Padre Shipping, Inc. v. Yong He Shipping</u>, 2008 WL 1869212, *5 (S.D.N.Y. 2008) for the proposition that "*** courts are to consider the law chosen by the parties to govern that contract". Pl. Opp. Memo., P. 20. Defendant agrees and has consistently pointed plaintiff and this Court to paragraph 15 of the Purchase Contract which the parties negotiated to require all disputes to be heard in a London Arbitration under English law.

Second, plaintiff's reliance on <u>Centrament Trading S.A. v. Egyptian American Steel Rolling Co.</u>, 07-cv-6379 (RMB) (S.D.N.Y. Sept. 28, 2007) is misplaced. The defendant in Centrament, which unsuccessfully moved to vacate the attachment, was very involved in the maritime aspects of the disputed agreement including the following, none of which are present in the instant case, but are compared for illustration below:[2]

| <u>Egyptian American's Actions</u> | <u>Progetra's Actions</u> |
| --- | --- |
| Negotiated the demurrage rate during the nomination of vessels. | Purchase Contract paragraph 6 obligates Buyer (Petraco) to nominate the vessel. |
| Entered into a contract incorporating a charter by reference. | There is no "charter party incorporated by reference" in the Purchase Contract or its amendments. |
| Specifically endorsed the demurrage clause incorporating a charter party. | No specific endorsement. |
| Reviewed and approved the planned charter agreement. | Completely removed from charter negotiations and no obligation to review, approve or endorse. |
| Arranged for precise language contained in negotiable bills of lading covering the goods shipped. | There is no evidence of Progetra's involvement with negotiating any language in any bills of lading. |

It is clear from an analysis of the Centrament case that the facts in the instant case are not nearly as maritime related as plaintiff's conclusory allegations may imply.

---

[2] <u>Centrament Trading S.A. v. Egyptian American Steel Rolling Co.</u>, 07-cv-6379 (RMB) (S.D.N.Y. Sept. 28, 2007) (Plaintiff Centrament Trading S.A., Memorandum of Law in Opposition to Motion to Vacate, Page 15, dated September 18, 2007), attached hereto as **Exhibit "A"**.

In addition, plaintiff admits that title of the goods passes once the cargo passes over the ship's flange[3] further supporting defendant's argument that the Purchase Contract is one for the sale of goods and any reference to the manner of transportation is merely incidental to defendant's obligations.

At this stage of the proceedings in the instant case, the burden remains on plaintiff to prove pursuant to Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd., 460 F.3d 434, 443 (2d Cir. 2006): (i) filing and service requirements of Supplemental Rules B and E; (ii) valid prima facie admiralty claim against defendant; (iii) defendant cannot be found within the district; (iv) defendant's property may be found within the district; and (v) no statutory or maritime law bar to the attachment. Id. at 445.

The primary objective of the Purchase Contract before this Court is for the sale and purchase of gasoil. As in the case of Aston Agro-Insutrial AG v. Star Grain Ltd., 2006 WL 3755156 (S.D.N.Y. 2006):

> [T]he contracts are not maritime contracts because their primary objective was not the transportation of goods by sea. Instead their primary objective was, undoubtedly, the sale of wheat. That the wheat was transported on a ship does not make the contracts maritime any more than it would make them aviation contracts had the wheat been shipped via airplane. Nor were they contracts between a seller and a shipper. In fact, [plaintiff] entered into two separate charter parties to accomplish the shipments of the wheat, and it was the primary maritime objective of *those* contracts to transport the wheat by sea.

Id. at *3 (emphasis in original). Judge Daniels granted Star Grain's motion to vacate the attachment.

In the instant case, no shipper or provider of maritime services is involved. This is purely a dispute over payment between a buyer and a seller of gasoil

---

[3] Affirmation of Imogene Jane Rumbold, P. 5. We note that Ms. Rumbold does not affirm her admission to practice law in the Southern District of New York nor has defendant's counsel received service of any motions for pro hac vice.

neither of which had the obligation or even the apparent ability to render maritime services.

Plaintiff's verified complaint fails to meet the burden set forth in <u>Aqua Stoli</u>.[4]

## REPLY TO POINT VII
## REQUEST FOR DISCOVERY IS PREMATURE

As discussed above, if this Court grants defendant's motion to vacate the attachment and dismiss the action, there is no issue for which this Court would retain jurisdiction.

## REPLY TO POINT VI
## INTERVENOR'S STANDING

As discussed above, if this Court grants defendant's motion to vacate the attachment and dismiss the action, there is no issue for which this Court would retain jurisdiction. However, the issue of assignment, which would not be properly before this Court, was discussed in <u>Egyptian Navigation Co. v. Baker Investments Corp.</u>, 2008 WL 1748456 (S.D.N.Y. 2008), and plaintiff cites to this case in which "*** Judge Stein made an extensive analysis of the requirements for both statutory and equitable assignment under English law"[5] <u>and vacated the attachment based on the assignment.</u>[6]

The determination of the assignment is not relevant to the initial determination of whether or not this Court has jurisdiction over any part of the action. Plaintiff's four "contradictions" to RZB's claims[7] are nonsensical: (1) of course defendant retained counsel, it is an active corporation not willing to forgo hundreds of thousands of dollars

---

[4] The Court isn't required to look beyond the verified complaint. Supplemental Rules E(2)(a); <u>Tide Line, Inc. v. Eastrade Commodities, Inc.</u>, 2007 AMC 252 (S.D.N.Y. 1979). Even if this Court looks beyond the verified complaint, the result should be the same.
[5] Pl. Memo, P.14.
[6] Plaintiff also makes certain references to Ohio law, which have no relevance to this action.
[7] Pl. Memo, P.14.

to which it is entitled or is assigned to fulfill other obligations; (2) in each filing

defendant has made it has objected to plaintiff's improper service and lack of jurisdiction,

beginning with it's letter this Court on May 12, 2008 (see replies to points III and II

below); (3) again, defendant's classification of funds which may be its own or otherwise

is responsive to plaintiff's allegations and is otherwise irrelevant to this matter at this

time; and (4) see Reply Point V below.

<div align="center">

**REPLY TO POINT V**
**DEFENDANT IS ENTITLED TO COSTS AND FEES**

</div>

Defendant is entitled to costs and attorney's fees for plaintiff's bad faith, malice

and gross negligence in admitting that jurisdiction over this matter resides in London and

attaching funds ex parte in order to gain leverage in the arbitration which has not yet been

commenced.  In any event, costs and attorney's fees for pre-arbitration attachments have

been awarded in confirming arbitration awards in this district.  C.T. Shipping, Ltd. v.

DMI (U.S.A.) Ltd., 774 F.Supp. 146 (S.D.N.Y.,1991).

<div align="center">

**REPLY TO POINT IV**
**THIS COURT LACKS FEDERAL COURT JURISDICTION**

</div>

Plaintiff cites both the Convention on the Recognition and Enforcement of

Foreign Arbitration Awards ("Convention") and the Federal Arbitration Act ("FAA") to

support its allegation that the maritime attachment and this Court's jurisdiction "*** may

be necessary in order to give effect to the London Arbitration".  Pl. Memo, P. 11.  This

allegation in the Verified Complaint and repeated here is an improper analyses of the

Convention and the FAA.  Plaintiff cites the Convention to provide, in part, that the court

shall "***at the request of one of the parties, refer the parties to arbitration" and the FAA

to provide, in part, "[a] court having jurisdiction under this chapter may direct that

arbitration be held in accordance with the agreement…" (emphasis supplied). Plaintiff has not requested that this Court "refer the parties to arbitration" or "direct arbitration to be held". Instead, plaintiff simply requested the attachment to "give effect" to arbitration which it has not commenced[8] and improperly requested an ex parte freeze of funds which may not even belong to defendant. Ms. Rumbold now threatens "***it will be necessary to seek Court intervention in order to proceed with the arbitration". This confirms that such a request has not yet been made and no arbitration has been commenced. Moreover, even if – which defendant does not concede on the facts – there was a current justicable dispute under the Convention creating a "federal question", there is neither personal jurisdiction over defendant nor proper venue in the Southern District of New York.

## REPLY TO POINT III
### UNAMBIGUOUS AND NEGOTIATED JURISDICTION AND VENUE PROVISION SHOULD NOT BE DISREGARDED AS THERE IS NO MARITIME CLAIM

Plaintiff's arguments with regard to the Convention and the FAA are circular. Plaintiff mischaracterizes defendant's argument as to state that the law and jurisdiction provision in the Purchase Contract "***deprive Plaintiff of the right to pursue a Rule B attachment, or this Court of jurisdiction" which is not correct or complete. It is the lack of a maritime claim, not the contract provision alone, that deprives plaintiff of what it seeks. The FAA only applies to this matter "[i]f the basis of jurisdiction be a cause of action otherwise judiciable in admiralty" – which it is not.

---

[8] Plaintiff's comments about and the communication attached to Ms. Rumbold's affirmation are attempts to excuse its failure to commence arbitration in the proper forum.

## REPLY TO POINT II
## IMPROPER SERVICE

Federal Rules of Civil Procedure Rule 4 require compliance with federal and local rules and applicable foreign law in the serving of process. In particular, service of process must to be made through rogatory channels in compliance with the Convention of the Service Abroad of Judicial and Extrajudicial Documents in Civil or Criminal Matters (done at The Hague, November 15, 1965). As the United States is a member of that convention, plaintiff was required to comply with its service provision, regardless of the limited service requirements under Rule B of the Supplemental Rules. In fact, no private service is permitted in Switzerland and plaintiff may be in violation of Article 271 of the Swiss Criminal Code. It is clear that this non-maritime claim is an attempt to strong arm defendant into a Court where it does not meet any other service or minimum contacts tests. The use of the flexible service provision under Supplemental Rules should not be rewarded simply by labeling a case as "maritime".

## REPLY TO POINT I
## DEFENDANT'S APPEARANCE IS RESTRICTED

Every communication with the Court and with the plaintiff in this action has been to challenge to this Court's jurisdiction. It is not rational of plaintiff to believe that a general appearance was made by defendant while continuing to defend against meritless jurisdictional claims. In any event, plaintiff's counsel could not, even if it tried, create subject-matter jurisdiction where none otherwise exists.

For the foregoing reasons, plaintiff has failed to meet the required burden to maintain this action and therefore the Verified Complaint must be dismissed.

**WHEREFORE**, Defendant Progetra SA respectfully requests that the Court grant its motion:

    a.   for an order vacating the attachment;

    b.   for an order quashing the order of garnishment and attachment;

    c.   for an order dismissing the Verified Complaint, with prejudice;

    d.   for Defendant's fees, costs, and attorney's fees in making this motion defending this action; and

    e.   for other and further relief as may be just and proper.

Dated:    New York, New York
            July 17, 2008

FAUST OPPENHEIM LLP

BY: _____
        David I. Faust (DF-9739)
        Petra von Ziegesar (PV-3568)
        488 Madison Avenue, 17th Floor
        New York, New York 10022
        T: (212) 751-7700
        Attorneys for Defendant Progetra SA

To:    Simon Harter, Esq.
       Attorneys for Plaintiff Petraco Oil Co., Ltd.
       304 Park Avenue South - 11th Floor
       New York, New York 10010

       Jorn A. Holl, Esq.
       Attorneys for Intervenor RZB
       Kavanagh Maloney & Osnato LLP
       415 Madison Avenue
       New York, New York 10017

WATSON, FARLEY & WILLIAMS (NEW YORK) LLP
Counsel for Plaintiff
100 Park Avenue, 31st Floor
New York, NY 10017
Tel: (212) 922-2200
Fax: (212) 922-1512


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CENTRAMET TRADING S.A.,

                              Plaintiff,

          - against -

EGYPTIAN AMERICAN STEEL ROLLING
COMPANY,

                              Defendant,

---

07 CIV 6379 (RMB)


**PLAINTIFF CENTRAMET TRADING S.A.**

**MEMORANDUM OF LAW**

**IN OPPOSITION TO MOTION TO VACATE**

Of Counsel
Alfred E. Yudes, Jr.
Neil A. Quartaro

19092059 v1

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

FACTS .............................................................................................................................. 1

LEGAL ARGUMENT .................................................................................................... 11

POINT I
THE FACTUAL ISSUES RAISED BY EASR ARE PROPERLY HEARD BY THE
ARBITRATORS ............................................................................................................. 11

POINT II
THE COURT HAS MARITIME JURISDICTION ......................................................... 12

POINT III ........................................................................................................................ 19
THE ATTACHMENT IS SUPPORTED BY THE FACTS AND
THE MERITS SHOULD BE HEARD IN ARBITRATION ........................................... 19

CONCLUSION ............................................................................................................... 22

19092059 v1

## TABLE OF AUTHORITIES

### Cases

*Aston Agro-Industrial AG v. Star Grain Ltd.*, 2006 WL 3755156 (S.D.N.Y. 2006). ........................................... 17, 18

*Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F. 2d 196, 199 (2d Cir. 2005)........................................... 13, 14

*Berwind-White Coal Mining Co. v. City of New York*, 135 F.2d 443, 446-447 (2d Cir. 1943) ................................... 16

*Compagnie Francaise de Navigation a Vapeur v. Bonnasse*, 19 F.2d 777, 779 (2d Cir. 1927)........................... 15, 17

*Flota Maritima Browning de Cuba S.A. v. Snobl*, 363 F.2d 733, 735-36 (4th Cir. 1966), ................................... 16, 17

*Folksamerica Reinsurance Co., v. Clean Water of New York, Inc.*, 413 F. 3d 307, 313-314 (2d Cir. 2005) ............. 13

*French Republic v. Fahey*, 278 F. 947 (D.Md. 1922)............................................................................................ 17

*Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 555 (2d Cir. 2000) ............. 14

*Ingersoll Milling Mach. Co. v. M/V Bodena*, 829 F.2d 293, 301 (2d Cir. 1987)...................................................... 13

*Natasha, Inc., v. Evita Marine Charters, Inc.*, 763 F. 2d 468 (1st Cir., 1985) ....................................................... 16

*Norfolk S. Ry. Co. v. James N. Kirby, Pty Ltd.*, 543 U.S. 12, 125 S.Ct. 385, 393, 160 L.Ed.2d 283 (2004) ............. 12

*PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1198 (2d Cir. 1996) .......................................................................... 11

*Rea v. The Eclipse*, 135 U.S. 599, 608, 10 S.Ct. 873, 34 L.Ed. 269 (1890) .......................................................... 14

*Shanghai Sinom Import and Export v. Exfin (India) Mineral Ore Co., Pvt. Ltd.*, (06civ4711)................................. 19

*Simon v. Intercontinental Transport (ICT) B.V.*, 882 F.2d 1435, 1442 (9th Cir. 1989) ......................................... 14

*Sirius Ins. Co. (UK) Ltd. v. Collins*, 16 F.3d 34, 37 (2d Cir.1994)............................................................ 13, 14, 16

*Sisson v. Ruby*, 497 U.S. 358, 364, 110 S.Ct. 2892, 2896, 111 L.Ed.2d 292 (1990).............................................. 12

*Smith/Enron Cogeneration Ltd. Partnership, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 92 (2d Cir. 1999) 11

*Thypin Steel Co. v. Asoma Corp.*, 215 F.3d 273, 278-79 (2d Cir. 2000)................................................................ 13

*Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 109 (2d Cir. 1997) ..................... 14

### Statutes

21 U.S.T. 2517 ..................................................................................................................................................... 11

9 U.S.C. § 202 ...................................................................................................................................................... 11

19092059 v1

## INTRODUCTION

This is a simple case about a shipload of scrap steel shipped from Russia to Egypt in the late summer of 2006 under a sale and transportation agreement (the "Agreement"). As is common in international transactions, the Agreement contains a broad arbitration clause requiring the parties to arbitrate in London, England. Unlike many such agreements, the Agreement in this matter contained a separate demurrage clause obligating Defendant Egyptian American Steel Rolling Company ("EASR") to pay applicable demurrage under a charter party. In addition to accepting responsibility for demurrage under the Agreement, EASR negotiated a demurrage rate during the nomination of vessels and specifically endorsed the demurrage clause incorporating a charter party. EASR also reviewed and approved the planned charter agreement and endorsed the charter fixture note and returned it to Centramet. EASR and Centramet are also parties to the bills of lading covering the subject shipment, the language of which was directly controlled by EASR.

In this circumstance, it is submitted, the claims related to the merits of the case should be sent to arbitration, while the Rule B attachment should be upheld on the basis that Plaintiff clearly has a maritime claim and Admiralty jurisdiction is, in this case, present.

## FACTS

Centramet Trading S.A. ("Centramet") and GST Commodities Trading Company ("GST") operate together to negotiate the sale and transportation of certain goods, including scrap metal. Declaration of Petr Terebov, dated September 18, 2007 ("Terebov Dec") ¶ 1-2. In June, 2006, GST concluded the Agreement with EASR for the sale and transportation by water of scrap steel. Terebov Dec. ¶ 3. This was the first contract that GST has entered into with EASR and throughout the negotiations Centramet and GST were represented by Petr Terebov,

1

who dealt with EASR and Beshay Steel interchangeably. *Id.* The Agreement was for the sale and transportation by water from Russia to Egypt of 20,000 metric tons of steel scrap at $303 per metric ton. EASR also agreed to pay any applicable demurrage. Terebov Dec. Ex. 1. The Agreement allowed partial cargoes to be delivered and it was anticipated that, in addition to the voyage at issue here, other vessels would be required to deliver the required quantities. *Id.*

The Agreement contains an arbitration clause stating:

> All disputes in connection with the present contract shall be finally settled under the rules of Conciliation and Arbitration of the International Chamber of Commerce, by one or more, appointed in accordance with said rules. . . .This contract shall be governed by and in accordance with the laws of England. The seat of Arbitration will be London, England.

Terebov Ex. No. 1.

The Agreement further provides that:

> Demurrage to be as per Charter Party covering the respective voyage and free dispatch respectively. Demurrage rate to be indicated at time of vessel's nomination.

Terebov Ex. No. 1.

Because the Agreement required EASR's assent to the terms of the Charter party, specifically the demurrage rates and discharge capacity, EASR specifically initialled the above clause. Terebov Dec. Ex. 1. Additionally, EASR had the right to approve or reject vessels, and a number of vessels were nominated to EASR. Terebov Dec. Ex. 1; Terebov Dec. ¶ 8-9. The first vessel nominated to EASR was M/V OCEAN BEAUTY. Terebov Dec. ¶ 8. The vessel was nominated by forwarding via email dated July 12, 2006, the demurrage and discharge rate details of the proposed fixture. *Id.* The email was then returned via fax bearing the endorsement of Beshay Steel, which is simply EASR by a different name. Terebov Dec ¶ 3 and Ex. 2;

19092059 v1

Beshay Dec. ¶ 6. EASR has not disputed that its practice was to approve the charter party by endorsing the fixture note, or that this process was followed with M/V OCEAN BEAUTY.

The fixture for M/V OCEAN BEAUTY was not consummated and later on July 12, 2006, another vessel, M/V MERVE A (the "Vessel"), was nominated to EASR via email. Terebov Dec. ¶ 9. This email contained the entire fixture for the Vessel, and indicated a demurrage rate of $7500 per day. Terebov Dec. Ex. 3. As with the previously nominated vessel, the fixture for the Vessel was endorsed by Beshay Steel and returned via fax dated July 12, 2006. Terebov Dec. ¶ 9; Terebov Dec. Ex. 3. The endorsement indicated that the Vessel was acceptable, but that EASR would only agree to a demurrage rate of $7000 per day. Terebov Dec. Ex. 3.

EASR disputes that it endorsed the fixture for M/V MERVE A that showed a demurrage rate of $7,000 day. Declaration of Eng. Kamal Beshay, dated August 31, 2007, (the "Beshay Declaration") ¶ 21. Instead, EASR claims this document is forged, and advances a fixture for the Vessel noting a demurrage rate of $5000 per day, and bearing a purported endorsement by Beshay Steel agreeing to a demurrage rate of $1500 per day.[1] Prior to this litigation, the alternative fixture note advanced by EASR had not been seen by Centrament. Terebov Dec. ¶ 10. These accusations are irrelevant to the issues at hand because EASR does not dispute that, under the Agreement, it is responsible for paying demurrage. There is also no dispute that, shortly after receiving EASR's assent to the Vessel's charter terms, Centramet fixed the Vessel to carry the cargo covered by the Agreement with a demurrage rate of $7000 per day. Terebov

---

[1] Both the fixture notes proffered by Centramet appear to have been sent form the same fax, which is understood to be EASR's fax, and bear identical fax headers. *Compare* Terebov Ex. 8

3

Ex. 5, pg. 2. At no relevant time was the Vessel offered to Centramet (or EASR) with a demurrage rate below $7000 per day. Terebov Dec. ¶ 10.

The Beshay Declaration and Declaration of Nader Issa (the "Issa Dec.") contain a number of accusations of forgery, which are completely denied. Many of the claims border on the farcical, such as the claim that similar stamps bearing EASR's full name and an initial are evidence of forgery. Beshay Dec. ¶ 21. Stamps, of course, give nearly identical images each time they are used. EASR's claim that the contract amendment, produced at Beshay Ex. 19, is forged is similarly pointless, since the amendment appears to be purely technical and does not relate to any issues before either this Court or the Arbitrators. EASR is simply trying to cast aspersions on Centramet in a misguided effort to distract this Court from EASR's clear responsibility to pay demurrage under the Agreement.

Payment of the contractual purchase price was to be made by way of an irrevocable letter of credit in the amount of $6,060,000 issued by Arab African International Bank on behalf of EASR on June 25, 2006 and amended on July 9, 2006 (the "Letter of Credit"). Terebov Dec. ¶ 13. The Letter of Credit was drawable against documents including the following:

    a. two original and two copies of the Commercial Invoice

    b. three original bills of lading ("Bills of Lading") issued to the order of the Issuing Bank

    c. draught survey report issued in loading port by inspectorate.

*Id.*

---

*and* Terebov Ex. 9.

19092059 v1

The Letter of Credit was for the cargo only and did not provide for demurrage. Terebov Dec. ¶ 14. As is standard practice, the Bills of Lading covering the shipment contained a description of the goods. Terebov Ex. 7.

On August 3, 2006, GST's Bank Finansbank Holland NV, notified GST by letter that the letter of credit presentation documents had been refused due to several discrepancies, one of which was the Bills of Lading. Terebov Ex. 8. At this time, it was discovered that Additional Condition 7 of the Letter of Credit, which states "only commercial invoice and copy of the beneficiary's fax to show goods description, unit price, delivery term and value of goods" was being used by EASR to refuse payment under the Agreement and the Letter of Credit, alleging this implied that the Bills of Lading should not contain a description of the goods. Terebov Dec. ¶ 17; Terebov Dec. Ex. 6, p. 3.

The requirement that the Bills of Lading bear no description of the goods they covered is not a *bona fide* commercial requirement and effectively functioned as a trap, since the bank would not release payment under the Agreement and EASR refused to correct the situation without extracting significant price concessions. Terebov Dec. ¶ 18. GST attempted to rectify the discrepancies but bills of lading, which function as a document of title, must include a description of the goods they cover. Terebov Dec. ¶ 19.

In another attempt to place the merits of the demurrage dispute before this Court, the Beshay Declaration asserts that GST had agreed to release the cargo without production of the original Bills of Lading, relying on a letter fax of August 2, 2007 from GST. Beshay Dec. Ex. 14. However, this assertion is misleading and incorrect because the Agreement itself contains no provision for cargo to be delivered without production of Bills of Lading. See Terebov Dec. Ex.

5

1.   Instead, item 7 of the documents to be produced in order to claim payment under the Letter of

Credit states:

> Copy of benef. [beneficial] fax sent to the Shipping Agency to
> permit (sic) release of goods against Shipping Letter of Guarantee
> issued by the issuing bank in case of delay of the original
> documents.

Terebov Dec. Ex. 6, p. 2.

The August 2, 2007 letter fax relied on by EASR is addressed to the Vessel Owners' Agents,

Active Marine, and not to EASR, and is in contemplation of receiving either payment or an

appropriate guarantee of payment. Terebov Dec. ¶¶ 20-22. This was never done. The reason for

such a requirement is simple: in this arms-length transaction, the cargo would only be released

when EASR paid for it.[2]  *See* Terebov Dec. Ex. 1.  It is undisputed that EASR was refusing to

pay, so delivery was made impossible under this provision.  Moreover, there is simply no reason

for delivery to be delayed if payment was effected, which was the whole point of the transaction.

In any event, there is no evidence of an appropriate letter of guarantee that would have allowed

the release of the cargo[3] and it is flatly denied that presentation of the Bills of Lading was waived

without a corresponding payment under the Letter of Credit. Terebov Dec. ¶ 21.

The Vessel sailed from Novorossisk, Russia on July 29, 2006, arriving off Alexandria,

Egypt on August 6, 2006 with her cargo of 9,274.897 metric tons of scrap metal. Terebov Dec. ¶

23.  The Vessel began to discharge the cargo on August 8, 2006 (without presentation of the

---

[2]  In fact, it was EASR's refusal to pay as required by the Agreement that first led to discharge
operations halting.

[3]  EASR has offered an untranslated Arabic-language document as evidence that it provided a
bank guarantee. Centramet denies ever receiving this document, but is unable to opine on its
contents.

19092059 v1

Bills of Lading) but on August 8, 2006, GST received a telephone call and letter from Mr. Nader

Issa alleging that the cargo on the vessel was of poor quality. Terebov Dec. Ex. 9. Though Mr.

Issa states that the cargo was seriously defective and that Centramet admitted this fact, Mr.

Terebov denies ever making such a statement. *Compare* Nissa Dec. ¶ 4 *with* Terebov Dec. ¶ 25.

Mr. Terebov's recollection is bolstered by EASR's own surveyors, who found that only 4.35% of

the cargo was off grade, impure, or slag, which is completely within the normally accepted

commercial tolerance for a scrap steel cargo. Terebov Dec. Ex. 10.   In fact, since some of the

slag and oversize material is useful scrap, EASR's survey shows that 97.13% of the cargo was

actually of acceptable grade. *Id.*


The real reason that EASR found "quality problems" and otherwise delayed discharge

and payment was that the market price of steel scrap went down by $30 to $40 per metric ton at

the beginning of August 2006. Terebov Dec. ¶ 27. The impossible Additional Condition 7 of

the Letter of Credit allowed EASR to hold up payment and demand price concessions, most

notably that the Agreement be modified by reducing the price to $270 per metric ton. Terebov

Dec. ¶ 27. This "offer" was refused, but a concession of $2 to $4 per metric ton was offered. *Id.*

In order to satisfy the strange demand that the Bills of Lading be modified so that they did not

describe the goods they covered, the ship owner was approached.   Terebov Dec. ¶ 28.

Unsurprisingly, the shipowner refused on the basis that owners' P&I club (similar to insurance)

would not insure goods covered by bills of lading that did not describe the goods. *Id.*


By late August, the parties were able to resolve the issues surrounding delivery and

payment.   Terebov Dec. ¶ 30.   EASR claimed to be having difficulties with sales and so

proposed cancelling the balance of the contract (as M/V MERVE A's cargo was a partial

7

shipment of the Agreement quantity and further shipments were contemplated) and decreasing the contract price for the arrived cargo by $15 per metric ton. *Id.* The terms of the agreement were that:

> a. EASR would make payment under the Letter of Credit in two tranches. The first payment would cover the agreed price, leaving outstanding $15 per metric ton and less $100,000.
>
> b. EASR would make payment under the amended Letter of Credit and a second payment of $100,000 against presentation of the draught survey report from the discharge port; and
>
> c. EASR would pay the outstanding $15 per ton in cash for the cargo once it had been discharged.

Terebov Dec. ¶ 30.

The resolution of the cargo payment issue did not address the issue of demurrage. Terebov Dec. ¶ 30-31. However, demurrage was discussed at the meeting and EASR did not object to paying it (demurrage had started, and was continuing, to accrue but had not yet reached great sums). *Id.* Of course, as EASR also had a contractual obligation to pay demurrage under the Agreement, it did not seem necessary to make a further agreement. *Id.*

EASR's protestations to the contrary, at no time did Centramet waive the demurrage bill or otherwise include this sum in some other payment. Terebov Dec. ¶ 32. In fact, at the time the amended price for the cargo was negotiated, the amount of the demurrage bill was not even known. *Id.* It stretches the imagination to believe that Centramet would have taken on the major commercial risk of allowing EASR an unlimited amount of free time to unload MERVE A. *Id.* There is no doubt that EASR knew that it was incurring demurrage because EASR requested, in the purported message of August 22, 2006, that:

19092059 v1

> After your bank sends this swift, the owner of MV Merve send a message to the maritime agent in alexandria MATINA SHIPPING AGENCY confirming that he gives him 9 days to resume discharging free from any demurrage for all the time lost till the day they resume discharging, starting from the day they re-start discharging.

Terebov Dec. ¶ 33.

While garbled, the purpose of the above request is clear: EASR is asking for nine days free of demurrage. Terebov Dec. ¶ 33. It is implicit in this request that demurrage would run again after expiry of the requested free time (the old shipping maxim is "once on demurrage, always on demurrage"). *Id.* This is obviously inconsistent with EASR's argument that all matters arising under the Agreement (including future demurrage) were settled by August 16, 2006. Beshay Dec. ¶ 17 and Exs. 16 & 17.

The original documentation was eventually sent to Egypt and cargo discharge operations restarted on August 31. Beshay Dec. ¶ 17; Terebov Dec. ¶ 34. Payment was received under the Letter of Credit as per point 30(a) of the Terebov Declaration. Id. However, EASR failed to produce the discharge port survey, frustrating attempts to recover the final $100,000 under the Letter of Credit. *Id.* EASR also failed to pay the $15 MT it had agreed, but recovery of those sums is not being sought at this time. *Id.*

The discharge of the cargo was delayed several times as the Vessel was sent to anchor between August 9, 2006 and August 30, 2006 due to the events described above. Terebov Dec. ¶ 35; Beshay Dec. Ex. 12. Subsequent discharge was interrupted again between September 5, 2006 and September 8, 2006 and between September 11, 2006 and September 23, 2006. Terebov Dec. ¶ 35; Beshay Dec. Ex. 12. The Vessel's cargo discharge operation was finally

9

completed on September 30, 2006. *Id.* All of these delays were ultimately attributable to, or the responsibility of, EASR.

Following a meeting with the Vessel's agents in early September, Centramet made an advance demurrage payment of $50,000. Terebov Dec. Ex. 12. On October 6, 2006, Centramet was invoiced for the outstanding amount of $276,299.75. Terebov Dec. Ex. 13. These invoices were forwarded directly to EASR, as were other demands for payment, including at an in-person meeting. Terebov Dec. ¶ 37. The invoice notes that the demurrage rate is $7000 per day. Terebov Dec. Ex. 13.

In an effort to collect the outstanding demurrage, the Vessel owner threatened arbitration in London under the charter party, securing its demurrage claim against Centramet by way of a Rule B attachment proceeding filed in the Southern District of New York and seeking $276,299.75 in outstanding demurrage, plus anticipated interest and costs. Terebov Dec. ¶ 48; Terebov Dec. Ex. 17. The attachment was granted and Centramet's funds were seized. *Id.* The Vessel owner's demurrage claim against Centrament was settled, with Centramet paying all outstanding demurrage to the Vessel owners. Terebov Dec. ¶ 49; Terebov Dec. Ex. 18. In total, Centramet paid $326,299.75 in demurrage and $18,323 in port costs for the extra time the Vessel spent in Alexandria. Terebov Dec. ¶ 43 and Exs. 13 & 14.

In the instant matter, arbitration in London has been initiated by Centramet, and EASR is due to respond by October 4, 2007 (the "London Arbitration"). Smallwood Dec. ¶11. The only claim advanced in the London Arbitration is the demurrage claim for which Centramet seeks security herein. Smallwood Dec. Ex. 1.

<div align="center">10</div>

## LEGAL ARGUMENT
## POINT I

## THE FACTUAL ISSUES RAISED BY EASR ARE PROPERLY HEARD BY THE ARBITRATORS

"The Federal Arbitration Act ["FAA"] creates a 'body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act.'" *PaineWebber Inc. v. Bybyk,* 81 F.3d 1193, 1198 (2d Cir. 1996) (*quoting Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)). An arbitration agreement subject to the 1956 New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("Convention") is enforceable under Chapter 2 of the FAA. *See* 9 U.S.C. § 201. An enforceable agreement to arbitrate exists under the Convention and the FAA if: (1) there is a written agreement; (2) the writing provides for arbitration in the territory of a signatory of the convention; (3) the subject matter is commercial; and (4) the subject matter is not entirely domestic in scope. *See Smith/Enron Cogeneration Ltd. Partnership, Inc. v. Smith Cogeneration Int'l, Inc.,* 198 F.3d 88, 92 (2d Cir. 1999); *see also* 9 U.S.C. § 202. If these conditions are satisfied, a federal court must compel arbitration of any dispute falling within the scope of the agreement pursuant to the terms of the agreement.

In the instant matter, there is no question that the parties have an enforceable arbitration agreement. EASR concedes that it entered into at least one of three iterations of the Agreement presented by EASR. Beshay Dec. ¶ 3. All of the iterations call for U.K. law (two for English law, and one for U.K. law), and two of them call for London arbitration. Beshay Dec. Exs. 1-3. EASR does not appear to object to the London, England Arbitration on jurisdictional grounds, and the arbitration has been initiated by Centramet. Smallwood Dec. Ex. 1. England is a signatory of the Convention. 21 U.S.T. 2517, TIAS 6997, 330 U.N.T.S. 38 (1970). There is no

11

dispute that the subject matter is commercial and entirely non-domestic. Accordingly, the requirements for ordering the merits of this dispute to arbitration are met.

Notwithstanding the well-developed body of law enforcing arbitration agreements, EASR attempts to place various issues related to the merits of the demurrage dispute before this Court by accusing Centramet and/or GST of ridiculous forgeries, most of which have no bearing on the matters before this Court. Centramet submits that, under Rule B and its related caselaw, the issues are relatively straightforward. Since it is uncontested that all disputes under the Agreement must be referred to arbitration, the merits of the demurrage dispute are reserved for that panel. All of the other arguments raised, including the accusations of forgery, by EASR are red herrings, cast into this proceeding in a desperate attempt to avoid what is almost certain to be a summary award by an arbitration panel in London. The only issue that remains is whether or not the exercise of Admiralty subject matter jurisdiction in this case is proper.

## POINT II
## THE COURT HAS MARITIME JURISDICTION

The Supreme Court has observed that there are few "clean lines between maritime and non-maritime contracts." *Norfolk S. Ry. Co. v. James N. Kirby, Pty Ltd.*, 543 U.S. 12, 125 S.Ct. 385, 393, 160 L.Ed.2d 283 (2004). Admiralty jurisdiction over contracts involves a conceptual analysis, rather than a set of clear cut rules. *Id.* Accordingly, the Supreme Court has promulgated an approach that requires a factual review in order to determine if a given contract can be said to have a sufficient maritime nexus to support the exercise of admiralty jurisdiction. *Sisson v. Ruby*, 497 U.S. 358, 364, 110 S.Ct. 2892, 2896, 111 L.Ed.2d 292 (1990) (Scalia, J., concurring).

12

While "'[t]he precise categorization of the contracts that warrant invocation of the federal courts' admiralty jurisdiction has proven particularly elusive,'" *Ingersoll Milling Mach. Co. v. M/V Bodena*, 829 F.2d 293, 301 (2d Cir. 1987) (quoting *CTI-Container Leasing Corp. v. Oceanic Operations Corp.*, 682 F.2d 377, 379 (2d Cir. 1982)), the abiding instruction of the Supreme Court is that Courts should look to the contract's "'nature and character'" to see "whether it has 'reference to maritime service or maritime transactions,'" *Norfolk S. Ry. Co.*, 125 S.Ct. at 393 (quoting *N. Pac. S.S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co.*, 249 U.S. 119, 125, 39 S.Ct. 221, 63 L.Ed. 510 (1919)).

### Threshold Inquiry

A number of cases in the Second Circuit appear to require District Courts to conduct a threshold inquiry before turning to the contract at issue: "[b]efore attempting to categorize contractual rights as maritime or non-maritime, a federal court must first consider whether an issue related to maritime interests has been raised." *Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F. 2d 196, 199 (2d Cir. 2005); *Thypin Steel Co. v. Asoma Corp.*, 215 F.3d 273, 278-79 (2d Cir. 2000); *Sirius Ins. Co. (UK) Ltd. v. Collins*, 16 F.3d 34, 37 (2d Cir.1994). Recently, the Second Circuit conducted the threshold enquiry in examining Admiralty subject matter jurisdiction in regard to a contract alleged to be maritime in nature, but noted that it is uncertain whether this requirement survives the Supreme Court's *Kirby* decision. *Folksamerica Reinsurance Co., v. Clean Water of New York, Inc.*, 413 F. 3d 307, 313-314 (2d Cir. 2005). In any event, the issue currently before the Court is a Rule B attachment seeking security for a demurrage claim being advanced in the London Arbitration. Demurrage is unquestionably a

13

maritime issue. Thus, in the event this Court finds that the threshold enquiry standard survived

the Supreme Court's decision in *Kirby*, Centramet's demurrage claim easily passes this test.


### The Agreement is a Mixed Contract

Prior to the development of modern admiralty jurisprudence, admiralty "jurisdiction was

said to be reserved to 'contracts, claims, and services purely maritime.'" *Rea v. The Eclipse*, 135

U.S. 599, 608, 10 S.Ct. 873, 34 L.Ed. 269 (1890). This test has, however, been expanded

considerably so that admiralty jurisdiction is held to cover the separable maritime portions of

mixed contracts that are not primarily maritime, if these can be separately litigated without

prejudice. *Atlantic Mutual*, 968 F.2d at 199; *Transatlantic Marine Claims Agency, Inc. v. Ace*

*Shipping Corp.*, 109 F.3d 105, 109 (2d Cir. 1997) (recognizing "two exceptions to the general

rule that 'mixed' contracts fall outside admiralty jurisdiction"); *Simon v. Intercontinental*

*Transport (ICT) B.V.*, 882 F.2d 1435, 1442 (9th Cir. 1989); *Sirius*, 16 F.3d at 36.


The first of the exceptions[4] recognized by the Second Circuit and many other Federal

courts, which Centramet contends governs the Agreement, is that a Federal court can exercise

Admiralty jurisdiction over a 'mixed' contract if "... the claim arises from a breach of maritime

obligations that are severable from the non-maritime obligations of the contract." *Hartford Fire*

*Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 555 (2d Cir. 2000). As

was eloquently stated by Judge Learned Hand:

> [I]n so far as the maritime obligations [of a contract] may . . . be
> separately adjudicated, there is no objection to the jurisdiction of
> the admiralty pro tanto. This is clearly intimated in *Turner v.*
> *Beacham*, Fed. Cas. No. 14,252, and *The Pennsylvania*, 154 F. 9

---

[4] The other exception, not raised here, is where the shore-based portions of the contract at issue are merely
incidental to the maritime portions of the contract.

> (C.C.A. 2), though the decisions did not require such a holding.
> <u>The mere fact that the contract covers a subject-matter of both
> kinds is not therefore decisive: that would make the mere form
> control. The substantial question is whether the maritime
> obligations can be separately enforced without prejudice to the rest.</u>

*Compagnie Francaise de Navigation a Vapeur v. Bonnasse*, 19 F.2d 777, 779 (2d Cir. 1927)
(emphasis added).

In the case at bar, there is no doubt that the Agreement is a mixed contract. While it does

provide for the sale of 20,000 MT of steel scrap on a CIF basis, the Agreement has a significant

maritime component in that it requires EASR to pay demurrage "per the Charter Party covering

the respective voyage . . .". Terebov Dec. Ex. 1. There is no dispute that EASR specifically

initialed the Agreement's demurrage clause. *Id.* While EASR disputes that it endorsed the

fixture note for the Vessel, EASR does not deny that its practice was to endorse fixture notes in

order to approve demurrage rates, and that it endorsed the fixture note for the first vessel

nominated to Centramet. (*Compare* Terebov Dec. Ex. 3 *with* Terebov Dec. Ex. 4). The

inescapable conclusion is that EASR also reviewed, approved and endorsed the fixture note for

the Vessel, which actually carried EASR's cargo. In sum, EASR:

- Negotiated a demurrage rate during the nomination of vessels;

- Entered into a contract requiring the goods purchased to be carried by water pursuant to a
  charter party incorporated by reference;

- Specifically endorsed the demurrage clause incorporating a charter party;

- Reviewed and approved the planned charter agreement;

- Endorsed the charter fixture note and returned it to Centramet

- Arranged for the precise language contained in negotiable bills of lading covering the
  goods shipped.

Centramet submits that these facts, combined with the fact that Centramet's claim is for

15

demurrage only (thus passing the threshold test), support this Court's exercise of Admiralty jurisdiction over this dispute.

There is no shortage of cases finding Admiralty jurisdiction over the severable maritime provisions of a mixed contract. *See, e.g., Sirius Ins. Co. (UK) Ltd. v. Collins* 16 F.3d 34 (C.A.N.Y. 1994) (upholding Admiralty jurisdiction over insurance contract providing for both maritime and shoreside coverage); *Berwind-White Coal Mining Co. v. City of New York,* 135 F.2d 443, 446-447 (2d Cir. 1943) (finding Admiralty jurisdiction over separable maritime portion of mixed contract); *Flota Maritima Browning de Cuba S.A. v. Snobl,* 363 F.2d 733, 735-36 (4th Cir. 1966), *cert. denied,* 385 U.S. 837, 87 S.Ct. 82, 17 L.Ed.2d 71 (1966) (finding Admiralty jurisdiction under mixed contracts doctrine over separable maritime claims under lease-purchase agreement); *Natasha, Inc., v. Evita Marine Charters, Inc.*, 763 F. 2d 468 (1st Cir., 1985) (upholding Admiralty jurisdiction over mixed contract providing for sale and charter of vessel).

**The Cases Cited by EASR Do Not Support Vacateur**

Tellingly, EASR does not discuss this well-developed body of law in its brief to the Court, choosing to discuss only the second exception to the mixed contracts doctrine. Instead of simply conceding that the doctrine exists, is good law, and supports maritime jurisdiction in this matter, EASR states "[I]t has been widely held that a commodity sale and purchase contract, such as the one entered into by EASR, even if the contract requires maritime transport and contains a demurrage clause relating to the shipment of the commodity, is not maritime". EASR's Memorandum in Support of Motion to Vacate, p. 11. To demonstrate how widely held

16

this principle of law is, EASR cites to a 1927 Maryland District Court decision, an unreported

slip opinion, and an unpublished oral opinion. None of these cases support EASR's Motion to

Vacate.

*French Republic v. Fahey*, 278 F. 947 (D.Md. 1922) is of questionable authority in this

matter.[5]  The *French Republic* Court cited only three cases, none of which related to the mixed

contract doctrine. *Id.*  Additionally, since *French Republic* was decided in 1922, the Fourth

Circuit decided *Flota Maritima Browning de Cuba S.A. v. Snobl*, 363 F.2d 733, 735-36 (4th

Cir.), *cert. denied*, 385 U.S. 837, 87 S.Ct. 82, 17 L.Ed.2d 71 (1966), which upholds the

separation of maritime and non-maritime causes of action under a mixed contract. The holding

of *Flota Maritima* thus requires an analysis of the mixed contracts that is glaringly absent from

*French Republic*, calling its analysis and holding into substantial doubt. Thus, to the extent that

*French Republic* calls for the dismissal of cases involving contracts not wholly maritime, it has

been overruled in the Fourth Circuit by *Flota Maritima*.  Of course, as an out-of-district lower

court decision, it carries no precedential authority of its own accord but, in any event, *French

Republic* is not good law in the Second Circuit because it predates Judge Learned Hand's

decision in *Compagnie Francaise* and is clearly preempted by that decision.

EASR also directs this Court to *Aston Agro-Industrial AG v. Star Grain Ltd.*, 2006 WL

3755156 (S.D.N.Y. 2006). Unfortunately for EASR, *Star Grain* is distinguishable on its facts

and does not provide significant guidance in this matter but, in any event this Court is not

required to accord the decision any precedential weight. The only obligation under the sale

---

[5]  Tellingly, *French Republic* has never been cited for the proposition that mixed contracts such
as the one at issue are not separable.

agreement in *Star Grain* was to pay for the cargo, which led Judge Daniels to observe that the "demurrage clauses do not explicitly contain any obligation on either party to compensate the other for demurrage owed to the vessel [and] merely set forth the rate at which any demurrage charge would be calculated should it occur". 2006 WL 3755156 *4. In the instant matter, the Agreement expressly obligates EASR to pay demurrage pursuant to the charter party. The clause of the Agreement referring to demurrage was specifically initialed by EASR and the vessel's fixture note was reviewed and signed by EASR. It is impossible to read the Sale Agreement here as not obligating EASR to pay demurrage. Additionally, Centramet's employee, Petr Terebov, met with EASR representatives who did not initially object to their obligation to pay the demurrage bill. There is also the fact that, in the instant case, it is undisputed that Centramet actually paid the demurrage it is seeking to recover from EASR, unlike in *Star Grain* where the demurrage had not been paid. 2006 WL 3755156 *4. Setting the instant matter and the *Star Grain* decision even further apart is the key distinction that the buyer's liability for demurrage in *Star Grain* could be determined without reference to the charterparty. In the case at bar, by contrast, the charter or fixture note must be read with the Contract in order to calculate demurrage.

Further distinguishing the *Star Grain* case is the nature of the attachment. In *Star Grain*, the plaintiff was seeking to attach funds pursuant to an arbitration award that awarded the plaintiff damages based only on the C.I.F. terms of that sale agreement, in effect the purchase price. The instant matter concerns a demurrage claim, not a cargo damage/risk of loss case as was before the *Star Grain* Court. Additionally, there is no underlying arbitration decision being enforced in the instant matter, as the parties are currently going to arbitration in London and no

18

ruling or award has yet issued.

Doubtless aware that its lack of jurisdiction argument is supported by the thinnest of arguments, EASR desperately cites to a transcript of an oral argument made before Judge Lynch in *Shanghai Sinom Import and Export v. Exfin (India) Mineral Ore Co., Pvt. Ltd.*, (06civ4711). As a threshold matter, Centramet notes that an oral opinion such as this does not establish precedent. In any event, Judge Lynch's decision is factually distinguishable from the matter at hand. Judge Lynch specifically noted that there was no allegation that the defendant breached the maritime portion of the contract at issue. Instead, the plaintiff before Judge Lynch filed suit on the basis of non-delivery of goods, an issue not present in the instant case, which would appear to fail the threshold test discussed *supra*. In the instant matter, Centramet is seeking the recovery of only those monies it spent to satisfy the demurrage claims of the vessel owner, squarely alleging that EASR breached the maritime provisions of the Contract. It is undisputed that EASR agreed to pay demurrage and initialed the demurrage clause in the Contract. EASR disputes that it specifically endorsed the fixture note for the Vessel, but does not dispute that it was EASR's practice to review and approve the fixture notes for vessels carrying cargo to EASR. EASR disputes that it approved a demurrage rate of $7,000 per day, but does not dispute that its practice was to approve the demurrage rate for vessels carrying its cargo or that the Vessel was used to do so.

## POINT III

## THE ATTACHMENT IS SUPPORTED BY THE FACTS AND THE MERITS SHOULD BE HEARD IN ARBITRATION

In a spectacular display of irrelevant misdirection, EASR's final attempt to sway this Court is made by launching a series of attacks on the credibility of Centramet, accusing it of

19

forgery and misrepresenting the amount owed in order to manufacture a claim. EASR's

allegations here are untrue, belied by the documents, and in any event properly heard in

arbitration. EASR alleges that the entire matter was settled on August 16, 2006, prior to the

accumulation of an additional approximately 45 days of further demurrage. However, a careful

reading of EASR's argument and the August 16, 2006 agreement shows that the only thing that

was settled was payment of the purchase price for the cargo. In order to give credence to

EASR's version of events, the issue of demurrage was settled even though it was not mentioned

in the cargo price adjustment and even though it would have been commercially unreasonable to

grant EASR an open-ended period of time to discharge the Vessel.

EASR's statement that paragraph 13 of the Verified Complaint is untrue likewise requires

a suspension of belief. If EASR is to believed, after discharge was halted because EASR had not

effected payment, Centramet agreed to allow discharge of the cargo on an unpaid, unsecured

basis. The simple fact is that EASR did not present either the Bills of Lading or a suitable

indemnity.[6] If it had, Centramet would have been happy to be paid for the cargo, which was the

goal of the entire transaction. Similarly EASR's claim of innocence with respect to the physical

operation of discharge is belied by EASR's own documents. Beshay Dec. Ex. 12 is a

handwritten statement of facts for the Vessel's discharge in Alexandria, with the final summary

annexed. As a review of this document makes clear, the Vessel experienced numerous delays

waiting for trucks to carry the cargo, waiting for the Bills of Lading, and moving to and from

anchorage due to EASR's discharge delays. Beshay Dec. Ex. 12. Notably, the statement of facts

indicates that the total delay for this voyage was 53 days. *Id.* EASR's claims of a non-

---

[6] EASR has proffered, at Beshay Ex. 14, a handwritten Arabic language document it claims is
the bank guarantee. Mr. Terebov denies have received this document, which would create an
issue of fact for the arbitrators. Counsel notes the unusual nature of a handwritten bank

20

complying cargo are also undermined by its own survey report, which shows 4.35% of the cargo

had potential quality issues (even here, some of the slag and oversize material is useful scrap,

which is why EASR's survey shows that 97.13% of the cargo was actually of acceptable grade).

EASR's conclusion that it is not responsible for demurrage under the Agreement is conclusory,

not supported by the documents, and is directly contradicted by Mr. Terebov.

Not content with simple misleading statements, EASR also embarks on a tortured

mathematical exercise which offers to prove that only 8.2 days of demurrage can be claimed

against it. For example, EASR argues it is entitled to "free time" even after demurrage days

commenced, which is contrary to the law that once demurrage commences, there is no free time,

or "once on demurrage, always on demurrage". *See, e.g. Texaco Panama, Inc. v. Sun Oil Co. of

Pennsylvania*, 572 F.Supp. 982 (D.C.Pa. 1983) (noting "general rule is 'once on demurrage,

always on demurrage'").

Mr. Terebov, at paragraphs 38 through 42 of his Declaration, explains his understanding

of the demurrage calculations, but the plain fact is that the Agreement requires EASR to pay the

demurrage bill, and the demurrage bill is for 48.42 days. Centramet respectfully submits that,

even if there is an issue related to the calculation of demurrage that might reduce the figure

below that claimed by the Vessel owner (which is denied but being verified), such an issue is for

the arbitrators.

Another issue for the arbitrators is EASR's statements and accusations regarding the

demurrage rate. Though EASR takes every opportunity to insist that it never agreed to a

demurrage rate of $7,000 per day, there is no question that this was, in fact, the demurrage rate

guarantee provided without translation.

19092059 v1

for the Vessel. There is also no question that the Agreement obligates EASR to pay demurrage. The only issue that EASR really raises here is the amount of demurrage, which, it is respectfully submitted, is a matter for the arbitrators.[7] The same is true for the additional port costs resisted by EASR, which EASR claims it is not responsible for. These port costs were strictly related to the slow discharge operation by EASR and are clearly recoverable as EASR's expense.

EASR flatly denies that Centramet demanded payment of the outstanding demurrage invoices. Centramet, for its part, details two meetings and appends a fax sent to EASR requesting payment. Centramet has stated that email communications were sent as well, but due to an unrelated theft of a laptop computer, these electronic records are not available (Centrament has, however, produced a police report documenting the theft). EASR does not argue that a failure to claim the amounts from EASR impacts Centramet's claim, so this appears to be yet another irrelevant accusation without no purpose except maligning Centramet. In any event, the essence of EASR's third argument is simple: Centramet's counsel should be sanctioned because he doesn't believe EASR's claims. While it is clear that some facts are in dispute, there are no claims advanced here that are knowingly false. Undersigned counsel has examined every document supplied by both parties, has requested and received additional supporting documents, and has conducted interviews to examine the claims advanced herein. There is a reasonable factual basis for every allegation in the Verified Complaint.

## CONCLUSION

EASR's Motion to Vacate is essentially two arguments. The first asks for the Rule B attachment to be vacated on the ground that Admiralty jurisdiction is lacking, the second asks

---

[7] To the extent that EASR is arguing that Centramet is oversecured, Centramet has made out a prima facie case for the amount claimed by showing the invoice bearing that amount and

22

this Court to vacate the attachment because EASR alleges that some of the underlying documents are not genuine. The first argument is unavailing because EASR clearly immersed itself in the maritime portions of the Agreement, which can and should be severed from the non-maritime obligations of the Agreement. The second argument carries even less weight and asks this Court to exercise its equity power to assess sanctions and vacate the attachment, based solely upon EASR's unproven and self-serving accusations of forgery. Centramet submits that it has effectively disposed of these arguments, and that, for the reasons above, the Rule Attachment should be upheld.

Dated: New York, New York
      September 18, 2007

<div style="margin-left: 3em;">

WATSON, FARLEY & WILLIAMS (NEW YORK) LLP

By: _____
Alfred E. Yudes (AEY-4152)
Neil A. Quartaro (NAQ-9640)
100 Park Avenue, 31st Floor
New York, NY 10017
Tel: (212) 922-2200
Fax: (212) 922-1512

</div>

---

evidence that the stated sum was, in fact, paid.

19092059 v1